UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_ 8/20/2015___
```

-------------------------------------------------------------- X

MR. GLEN A. FOX,                              :
                                             :
                              Plaintiff,      :
                                             :            13-CV-3204 (VEC)
                 -against-                    :
                                             :            OPINION & ORDER
NEW YORK CITY DEPARTMENT OF                  :
EDUCATION and PS150,                         :
                                             :
                              Defendants. :
-------------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

Plaintiff Glen Fox, *pro se*, formerly a school guidance counselor at P.S. 150, initiated this

action against the New York City Department of Education (also known as the Board of

Education of the City School District of the City of New York ("BOE")) and P.S. 150.[1]  Fox

alleges that he was subjected to adverse employment actions (poor reviews, suspension, and

termination) and to a hostile work environment based on his race (white), religion ("Jewish

Christian"), age (47 at the beginning of the relevant period), and prior complaints regarding

mistreatment, all in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

U.S.C. § 2000e *et seq.*; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621

*et seq.*; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 290 *et seq.*; and

the New York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code § 8-101 *et seq.*

Defendants have moved for summary judgment.  Because Fox has not offered any evidence

showing that race, religion, age, or retaliatory animus played a role in the decision to bring

disciplinary charges against him, Defendants' motion is GRANTED, and the case is

DISMISSED.

---

[1]      The case is dismissed as against Defendant P.S. 150, which is not a suable entity. *Nnebe v. Daus*, 644 F.3d
147, 158 n.6 (2d Cir. 2011); *Ximines v. George Wingate High Sch.*, 516 F.3d 156, 159 (2d Cir. 2008) (*per curiam*).

## BACKGROUND

Fox began working for the BOE in 1999; in 2004 he became a guidance counselor at P.S. 150.  Defs. Local Rule 56.1 Statement of Undisputed Material Facts ("56.1") ¶ 2.  Fox alleges that he "had a stellar record and no disciplinary issues" at P.S. 150 prior to the events at issue in this case and maintained a good relationship with the Principal who hired him.  Deposition of Glen A. Fox, Downs Decl. Ex. A, at 80.

### I.  Fox's Performance Issues

During the 2010-11 school year, the principal of P.S. 150 changed; Pamela Bradley, a 45-year-old black woman, became the new principal.  Within approximately one month, she and Fox had their first of several run-ins.  *Id.* at 29, 56.1 ¶ 10.  In October 2010, Bradley called Fox into her office and chastised him for not finishing an assignment on time.  Fox Dep. at 29-30.  When Fox asserted that he had finished the assignment, Bradley "called [him] a bullshit artist" and said that he "was not being truthful."  *Id.*

Fox and Bradley worked together uneventfully for the next few months, with only occasional problems relating to Fox's difficulties documenting his counseling efforts.  *See, e.g.*, Downs Decl. Ex. B at 23-25.  The relationship began seriously to unravel, however, towards the end of Bradley's first academic year as principal.  On June 1, 2011, Fox and his union representative met with Bradley to discuss formally why Fox had lied to an assistant principal regarding his progress on an important assignment (he indicated that he had finished it, but Bradley alleged that he had not).  Fox Dep. Ex. D at 1.[2]  Fox asserts that during the conversation he "was accused . . . of not doing [his] job."  Fox Dep. at 75.  In a letter-to-file that Bradley

---

[2]      The hearing officer held that disciplinary action against Fox based on his untimely data entry in May 2011 was unwarranted, in part because the deadline that Fox may have missed was one that Bradley had set, and Fox entered all data that was actually time-sensitive before the actual BOE deadline.  Downs Decl. Ex. B at 19-21.

wrote later the same day, she asserted that Fox "kept shouting that [he was] being attacked [and] had to be told several times . . . to calm down and take it down a level." Fox Dep. Ex. D at 1. Bradley described Fox's tone as "disrespectful and unprofessional" and his conduct as "misleading and deceptive." *Id.* at 2. Absent from Bradley's letter, but clearly reflected in the record, is her response to Fox's unprofessional conduct – she told Fox, in unequivocal terms, that he "was finished. She said that [he] was finished in terms of [his] career." Fox Dep. at 76; *see also Fox v. N.Y. City Dep't of Educ.*, No. 101263-2013 (Sup. Ct. N.Y. Cnty.), Apr. 23, 2014 Order ("Supreme Court Order"), Fox Decl. Ex. 1, at 3 ("[I]t is what Ms. Bradley said, loud enough to have others . . . outside the office hear, that revealed the Principal's true feelings. She shouted to Mr. Fox, twice: 'You're finished.'") (citation omitted).

The record is equally clear that after the June 2011 meeting, the relationship between Fox and Bradley was irreparably broken. Throughout the 2011-12 academic year, Bradley documented Fox's deficiencies. In September 2011, after Bradley spoke to Fox regarding his need to speak to students who had been disciplined and sent to the cafeteria, Fox failed to appear or to speak to the students. Fox Dep. Ex. G; Downs Decl. Ex. B at 25-26; Supreme Court Order at 6. Bradley held a meeting with Fox and his union representative to discuss this failure and Fox's continued difficulty with paperwork, which included information pertaining to where at least one fifth-grade student would be attending school the next year; Fox misreported the information to Bradley and disclaimed possession of documents that were subsequently discovered in his office. Fox Dep. Ex. G; Fox Dep. Ex. E; Downs Decl. Ex. B at 26-27. Bradley wrote a letter-to-file documenting Fox's unacceptably poor recordkeeping.

Fox's next misstep involved the disclosure of a disabled student's individualized education plan ("IEP") to the student's social worker, who did not have the appropriate authorization to see it. Fox Dep. Ex. H; Downs Decl. Ex. B at 27-28. As Bradley told Fox

during another disciplinary meeting with his union representative and in another letter-to-file, that disclosure violated BOE regulations. When confronted, Fox dissembled and gave multiple conflicting stories about how the social worker gained access to the information. *Id.* Bradley described Fox's disclosures and subsequent lying as "professional misconduct and dereliction of duty." *Id.*

Several months later, Fox attended a professional development day and left early (allegedly to tend to his sick daughter), without notifying any of his supervisors. Fox Dep. Ex. I.; Fox Dep. at 124  Although he walked directly past one of his supervisors on his way out, Fox apparently did not mention to her that he planned to leave early; when Bradley confronted him about his early departure, Fox indicated that he should have mentioned it, but that he was not thinking. Fox Dep. Ex. I.

Two of the more troubling events of the 2011-12 school year occurred in March. First, Bradley called Fox into the SAVE room – the room where school administrators would place children when they were removed from their classroom for disciplinary reasons, *see* Fox Dep. at 118 – and asked him to provide counseling to a student who was upset because another student had assaulted him and a classmate, Fox Dep. Ex. K at 1. Although the culprit had been taken to the Dean's office, the victimized students were "screaming and yelling and would not calm down," and a fourth student, who had difficulty handling loud noises, "began holding his head [and] rocking back and forth." *Id.* Bradley assigned a "crisis team" member to each of the three children in the SAVE room. *Id.* Fox left with one of the victims of the attack, but after "[a]pproximately two minutes," Fox returned without the student. When asked what happened to the student, Fox explained that the child had given him "a hard time," and when the Dean saw them together, he had offered to take the child to his office. *Id.* Fox did not tell the Dean that he (Fox) had been instructed by the Principal to counsel the child; instead, he permitted the child to

be taken to the Dean's office – where the student who had assaulted him had already been sent. *Id.* at 1-2.  Despite Bradley's repeated order that Fox retrieve the student from the Dean's office, Fox did not do so.  *Id.* at 2.  Fox's poor handling of the situation led several members of the crisis team to express their reservations about Fox, whom they believed to be "inadequate in responding to crises."  *Id.*  These events were memorialized in Bradley's April 5, 2012 letter-to-file and were confirmed by the administrative hearing officer.  Downs Decl. Ex. B at 29.

Less than one week later, Fox was called to the SAVE room to provide counseling to a student who was apparently suicidal.  Fox Dep. Ex. J at 1.  When Fox reported to the SAVE room, the Dean told him about the situation.  *Id.*  Fox told the Dean that he could not help "because [he] could not take lunch at another time."  *Id.*  When Bradley asked Fox if – as the Dean reported – the student had been in a "fetal position rocking back and forth when [Fox] arrived to the SAVE room," Fox responded that he did not know because he had not stepped inside the room.  *Id.*  The Dean, who was not a member of the crisis team, was in the SAVE room to deal with students serving suspensions; he was not equipped to provide the student with the attention that he required.  *Id*; Downs Decl. Ex. B at 30-32 (noting that Fox initially told Bradley that he analyzed the situation and determined that the student did not need immediate counseling).

Throughout the year, Fox continued to commit additional transgressions that brought him to the attention of the Principal.  For example, Fox reported to Bradley that one student had threatened to kill another.  Fox Dep. Ex. L at 1.  When Bradley instructed him to share the details of the situation with the Assistant Principal, Fox gave the Assistant Principal only a bare description of the threat and told her that the police were coming to the school because the mother of one of the students "was upset and coming to the school."  *Id.*  He told the Dean and the Borough Safety Director only that a student's mother was upset and coming to the school.

*Id.* When confronted by Bradley at a disciplinary hearing, Fox refused to answer any questions about his failure to report the incident. *Id.* at 1-2; Downs Decl. Ex. B at 32-33. In another incident, Fox failed to follow protocol in reporting a case of medical neglect to the New York City Administration for Children's Services ("ACS"), leaving the Dean unaware of the situation. Fox Dep. Ex. L at 2; Downs Decl. Ex. B at 33-34. Then, when Bradley asked Fox to report to ACS a case involving sexual abuse regarding two students, Fox left the paperwork for the case buried on the Dean's desk (despite clear direction that Fox should hand the paperwork directly to the Dean). Fox Dep. Ex. L at 2. Moreover, the report that Fox made to ACS involved *educational* neglect of the male student, not – as Bradley had directed – *sexual* abuse for both students. *Id.* During their follow-up meeting, Fox refused to answer questions regarding this event as well. *Id.* at 4. In May 2012, Bradley wrote a letter-to-file advising Fox that his "incompetent actions and failure to follow administrative directives have caused children to be placed in danger. These and any other future actions may and will lead to disciplinary action including an unsatisfactory rating and charges that could lead to [] termination." *Id.*; *see also* Downs Decl. Ex. B at 34-35. Later that month, Fox did not heed Bradley's directive to contact the ACS caseworker assigned to two students and misled the Principal regarding his efforts. Downs Decl. Ex. B at 36-37.

On June 25, 2012, Fox filed a complaint of discrimination with the New York State Division on Human Rights, 56.1 ¶ 3,[3] and Fox's difficulties with Bradley continued the following academic year. Notably, in September, Fox mischaracterized Bradley's policies in a conversation with an ACS worker; that worker then confronted Bradley about why she required

---

[3] Fox's Amended Complaint mentions only this State Division of Human Rights filing, and the record does not reflect any other administrative complaints. Fox's brief, however, mentions in passing that he "filed an SDHR complaint against the NYCDOE and his school administrators on November 9, 2010." Pl. Mem. at 4. The Court understands this to be an imprecise estimate of the date of Fox's complaint, as there is no other evidence of a complaint preceding the June 2012 complaint.

her staff to include confidential information in a student's official file – a requirement that Bradley had not instituted and that others at the school did not practice.  Fox Dep. Ex. M. Bradley's ensuing letter-to-file emphasized to Fox that he should maintain the confidentiality of all ACS records.  *Id.*  After this incident, the BOE brought disciplinary charges against Fox based on his cumulative failures and misconduct over the preceding year. 56.1 ¶ 57.

Fox was twice rated "Unsatisfactory" for his performance, and on October 18, 2012, Fox was suspended from his work as a guidance counselor.  *Id.* ¶ 58.  While he was suspended, Fox was required to report to P.S. 150 each day; he was assigned to sit in an office directly adjacent to Bradley's office.  *Id.* ¶ 61.  Fox's disagreements with Bradley continued during his suspension; on at least one occasion Bradley requested that Fox provide confidential information regarding a student's ACS file, and Fox declined to do so because he "was told by the union not to give [Bradley] anything."  Fox Dep. Ex. N.  Bradley, who believed the situation to be an emergency, allegedly told Fox, "If anything happens to this girl, it's on you."  Fox Dep. at 138. Fox interpreted Bradley's remark as a threat, further widening the chasm between boss and employee.  *Id.*

## II.     Bradley's Treatment of Fox and Other Faculty and Staff

Although Fox does not dispute Defendant's assertion that Bradley was unhappy with his work, he paints a different picture of his relationship with the Principal.  Fox alleges that Bradley did not like him or treat him with respect; in different contexts, Bradley would allegedly berate Fox in front of other faculty or staff.  *See, e.g.*, *id.* at 32 (Bradley "began yelling at" Fox and "demeaning" him "in front of the secretaries" because Fox sought to take a laptop from a colleague when Fox's was "on the fritz"); *id.* at 37 (Bradley "mistreated" Fox during her "cabinet meetings" (meetings with the leadership of the school)).  Fox testified that Bradley preferred to insult him in front of others – on one occasion, "Bradley was belittling

[him] . . . [and] stating that [he] was . . . stupid and that [he] could not understand what she was saying.  So she called Ms. King into her office who [sic] is African-American and she included Ms. King in the conversation.  And involved Ms. King in such a way that it demeaned [Fox] further.  It was ignorant and incompetent." *Id.* at 62.  The only positive feedback that Fox testified to receiving from Bradley was unwanted comments regarding his voice ("it was sexy") and his appearance ("she liked it").  *Id.* at 38; *see* Tr. of Oral Argument of July 28, 2015 ("Oral Arg."), at 21.

On one occasion (with which Fox took particular umbrage), Fox was summoned to the cafeteria.  When he arrived, Bradley "loudly told a bible story about Jesus washing the feet of his disciples.  And she told [Fox] after that story to watch her clean the tables.  And then she told [him] that [he] should do the same thing the way it was told in the bible."  Fox Dep. at 46-47.  Fox was unhappy that Bradley gave him "a directive as a principal of the school and use[d] a religious story that pertained to [Fox's] beliefs, and [required him] to clean tables which was not [his] job as a guidance counselor."  *Id.* at 47.

Fox alleges that Bradley did not treat all faculty and staff at the school badly.  The other counselor at the school, Ms. Robinson,[4] was a "black lady who was given tremendous favor by the principal."  *Id.* at 55.  Unlike Fox, Robinson was allegedly "given a lot of authority" and "praised . . . at the cabinet meetings while [Fox] was belittled."  *Id.* at 56.  Fox alleges that a family worker, Ms. Elikens, was able to work closely with Bradley because both women were black.  *Id.* at 59.  A third black woman, Ms. Kitty, "would say things that were unprofessional and Ms. Bradley would ignore it."  *Id.* at 60.  Fox alleges that Bradley's willingness to turn a blind eye toward Kitty's unprofessional comments was motivated by Kitty's race and the fact

---

[4]     Robinson was the school's Substance Abuse Prevention and Intervention Specialist, referred to as a "SAPIS" counselor.

that she "was from the [school's] neighborhood and she was very comfortable with working with people from the neighborhood." *Id.* Bradley praised the work of a small number of people in her cabinet meetings; these people included Dr. Abraham, a black person with an unspecified job, and a white female psychologist hired while Bradley was Principal. *Id.* at 58. The psychologist "was a young lady in her 20s" with an education background of which Bradley "spoke very highly." *Id.* at 53-54.

According to Fox, whenever he had a disagreement with one of the people whom Bradley treated well, Bradley would side with her favorite. *See, e.g.*, *id.* at 54 ("Bradley sided with th[e] younger psychologist that she hired" when she and Fox had disagreements); *id.* at 59 ("We had a disagreement in Ms. Bradley's first year, Ms. Elikens and myself, and she favored Ms. Elikens over me.").

Perhaps most annoying to Fox was the treatment of P.S. 150's Dean, Dr. Kwateng. Kwateng was hired during the 2011-12 school year and was "much younger" than Fox. *Id.* at 49; *see id.* at 51 (estimating that Kwateng was in his "early 30s"). Although Fox believed that he and Kwateng "should have been treated as equals," the new Dean received "favors" from Bradley and was permitted to give Fox "directives like an . . . administrator." *Id.* at 50. In addition to the perceived inequities in their assignments, Fox was upset that while Fox "was singled out as not doing [his] job [Kwateng] was praised for being a great dean." *Id.*

Fox was not the only member of Bradley's staff who felt unappreciated by the Principal. Warnie Wachuku, a senior math teacher, felt that Bradley unfairly videotaped her classes and forced her to help a fellow teacher prepare her classroom for students, even though that was not within Wachuku's responsibilities. Wachuku Aff., Fox Decl. Ex. 5, ¶¶ 3, 5-6. Sonia Muniz, another senior teacher, alleged that Bradley "continually harassed" her by commenting that she was responsible for poor student behavior. Muniz Aff., Fox Decl. Ex. 6, ¶¶ 3, 8-9. Maureen

Troici, a staff developer, alleged that Bradley assigned her to classes that she was not suitable to cover and "mistreated" her, including by videotaping her classes and observing her classes more frequently than she observed those of "the younger staff." Troici Aff., Fox Decl. Ex. 7, ¶¶ 3-13, 25. Mathew Chalil, a senior special education teacher, alleged that Bradley was unduly harsh to him. Chalil Aff., Fox Decl. Ex. 8, ¶¶ 3, 5, 8-10.

Three of these senior employees affirmed that on one occasion a CFN Network Leader[5] approached them "and made comments asking why were we still working (she knew we were the senior staff of the building). It was as if she was sent on a mission. She continued to ask: why don't we retire, why were we still there (i.e., at our age)." Troici Aff. ¶ 22. The older teachers alleged that Bradley made a number of comments regarding their seniority and salary. For example, Bradley "allud[ed] to the belief that there are not enough funds in the school budget to pay for senior staff salaries." Muniz Aff. ¶ 6; *see also* Troici Aff. ¶ 26 ("Bradley would publicly state how she was operating on a 'very weak budget.' She remarked that her school was 'top heavy' and had too many staff members at high salaries for such a small size school. She often said she could not order materials and supplies because she had no money due to this 'problem.'"). During the fall of 2012, Bradley and Chalil "got into a heated exchange" during which Chalil told her that he believed "[s]he wanted me out because I was earning the top salary. If I completed 2 more years, I could have retired with a better pension [but] after a few minutes of silence I told her 'Miss Bradley, my last day at this job will be on December 21, 2012.'" Chalil Aff. ¶ 11.

---

[5]      CFN refers to the "Children First Network," "a human resources management network within [the] Board of Education." *Merenstein v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 971 N.Y.S.2d 72 (table) (Sup. Ct. N.Y. Cnty. Oct. 18, 2012).

### III.     Procedural History

Fox's June 25, 2012 complaint with the New York State Division of Human Rights

complained of age discrimination, Am. Compl. at 11, and made factual allegations that Fox was

"discriminated against based on [his] age and race," *id.* at 13.   After an investigation into age-,

race-, and national origin-based discrimination, the Division of Human Rights concluded that

there was "no probable cause" to support Fox's claim.  56.1 ¶ 5.   The Equal Employment

Opportunity Commission adopted the state agency's findings and issued a Right to Sue letter on

February 11, 2013; Fox timely initiated this action in May 2013.  *Id.* at 9, Compl.

During the pendency of this action, the parties have also been litigating the BOE's

disciplinary charges against Fox, including a second set of charges that the BOE initiated in

February 2013.  56.1 ¶ 57.  In a 50-page Opinion and Award dated August 21, 2013, an

administrative hearing officer held that Fox's termination was appropriate.  Downs Decl. Ex. B.

Fox brought an Article 78 proceeding in New York Supreme Court to review that decision.  Fox

Decl. Ex. A.  On April 23, 2014, Justice Schlesinger overturned in part the hearing officer's

decision, holding that Fox had committed many of the charged transgressions but that he was he

was "good and successful" at his job and that termination was an inappropriately harsh remedy.

Supreme Court Order at 4.  Justice Schlesinger found that Bradley experienced "growing

frustration and irritation with her perception that Mr. Fox was not documenting matters to her

taste," but that did not provide a suitable ground for the "shockingly harsh" step of firing Fox.

*Id.*  The BOE appealed that decision to the Appellate Division.  Oral Arg. at 38.

Defendants moved for summary judgment in this action; the Court heard oral argument

on the motion on July 28, 2015.

**DISCUSSION**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal quotation marks omitted)). "The Court 'must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Pandora Media, Inc. v. Am. Soc. of Composers, Authors and Publishers*, 785 F.3d 73, 77 (2d Cir. 2015) (*per curiam*) (quoting *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008)). Nevertheless, "to defeat summary judgment, 'a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful.'" *Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 197 n.10 (2d Cir. 2014) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)).

When a party moves for summary judgment against a *pro se* litigant, courts afford the non-moving party "special solicitude." *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010). District courts must read a *pro se* litigant's "pleadings liberally and interpret them to raise the strongest arguments that they suggest." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (quotation marks and citations omitted). Courts "are less demanding of [*pro se*] litigants generally, particularly where motions for summary judgment are concerned." *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014). This lower standard for *pro se* plaintiffs does

not, however, "relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen*, 351 F.3d at 50 (quotation marks and citations omitted).[6]

## I.      Fox's NYSHRL and NYCHRL Claims Are Dismissed

"New York law mandates that no action, 'for any cause whatever,' 'shall be prosecuted or maintained against any school district or board of education unless it shall appear by and as an allegation in the complaint . . . that a written verified claim upon which such action is founded was presented to the governing body of said district or school within three months after the accrual of such claim.'" *Zambrano-Lamhaouhi v. N.Y. City Bd. of Educ.*, 866 F. Supp. 2d 147, 175 (E.D.N.Y. 2011) (quoting N.Y. Educ. Law § 3813(1)); *see also M.B. v. Islip Sch. Dist.*, No. 14-CV-4670(SJF), 2015 WL 3756875, at *13 (E.D.N.Y. June 16, 2015); *Vassilev v. City of New York*, No. 13-CV-5385(PAC), 2014 WL 3928783, at *3 (S.D.N.Y. Aug. 12, 2014).  Defendant alleges, and Fox does not dispute, that no notice of claim was filed in this case.  Accordingly, Fox's city and state law claims are dismissed.

## II.     Fox's Disparate Treatment Claims Are Dismissed

Fox alleges that he was subjected to averse employment actions and a hostile work environment, in violation of Title VII and the ADEA, because he is a white "Jewish/Christian" male over 40 years old.  Am. Compl. at 4.  Because Fox has no evidence that any of the adverse actions taken against him were motivated by discriminatory or retaliatory animus and cannot refute Defendant's proffered non-discriminatory reasons for its actions, Defendant is entitled to summary judgment.

---

[6]        Neither party has marshaled all relevant facts in support of its arguments, although the *pro se* party's omissions are more understandable.  The Court nevertheless reviews all of the evidence in the case to determine whether summary judgment is appropriate.  Fed. R. Civ. P. 56(c)(3).

Claims arising under Title VII and the ADEA "are governed at the summary judgment stage by the burden-shifting analysis first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015); *see Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (*per curiam*).   "Under *McDonnell Douglas*, a plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination; it is then the defendant's burden to proffer a legitimate non-discriminatory reason for its actions; the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination." *Abrams v. Dep't of Public Safety*, 764 F.3d 244, 251 (2d Cir. 2014).   "Where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, so that 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'"   *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (quoting *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994)). "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."   *Id.*

### A.  *Prima Facie* Case

To make a *prima facie* showing of discrimination, "the plaintiff must demonstrate that: (1) []he fell within a protected class under Title VII [or the ADEA]; (2) []he was qualified for the position []he held; (3) []he was subjected to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 45 (2d Cir. 2015).  Fox is protected as a white Christian over the age of 40.  The parties dispute the remaining three prongs of the *prima facie* case.

Defendant contends that, because the administrative determination of Fox's case concluded that he had committed almost all of the infractions that formed the basis of Defendant's decision to terminate him, Fox cannot establish that he was qualified for the position that he held.  Def. Mem. at 10.  The administrative decision was reversed in part, however, by Justice Schlesinger, who found that Fox – although he had committed a number of infractions – was "good and successful" at the work of a guidance counselor.  Supreme Court Order at 4. Although certain of Fox's actions lead this Court to question that assessment of his qualifications, the fact remains that Defendant has not carried its hefty burden to prevail at the summary judgment stage on its argument that Fox was not qualified for his position.  *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010).

Defendant next challenges what may be considered an "adverse employment action," specifically arguing that the individual letters-to-file that Fox received were not adverse employment actions.  "An employee suffers an 'adverse employment action' if he 'endures a materially adverse change in the terms and conditions of employment.  An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities.'"  *Tolbert*, 790 F.3d at 435 (quoting *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006)).  "Like other negative performance evaluations, letters to file do not rise to the level of an adverse employment action where . . . they do not trigger other adverse consequences, such as loss of pay."  *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 255 (E.D.N.Y. 2012).  The letters-to-file here – like those in *Sotomayor* – did not carry specific consequences with them. Accordingly, the only adverse employment actions at issue are Fox's "Unsatisfactory" ratings

and his suspension and termination.[7]  Even assuming that the letters-to-file were adverse

employment actions, however, Fox has no evidence that any adverse action was taken against

him based on his race, religion, or protected activity.  Fox has barely enough evidence to

generate a *prima facie* case of discrimination based on age, but he cannot refute Defendant's

proffered non-discriminatory basis for his termination, suspension, or rating.

### 1.  Race

Fox has identified no evidence that would permit a reasonable jury to infer that any of the

adverse actions taken against him were racially motivated.  He has not pointed to any comments

that Bradley or any other administrator made that led him to believe that his race – as opposed to

his persistent failure to live up to Bradley's expectations – led to the adverse actions taken

against him.  Fox's discussion of Bradley's behavior towards black faculty and staff focused

largely on her praising them during cabinet meetings and praising their work product.  *See, e.g.*,

Fox Dep. at 50, 56, 58; Oral Arg. at 22, 24, 26-27.  But Fox acknowledges that white employees

were also praised.  Fox Dep. at 58.  As to the comparators he proffers, aside from the fact that

they were black, Fox did not identify any "reason[] to believe that the treatment was based on

[their] race." *Id.* at 57.

Fox's sole evidence suggesting any racial animus is the fact that he is "a white male." *Id.*

at 126; *see also* Oral Arg. at 25.  Fox did not testify or otherwise offer a basis to conclude that

his work was as good as those of his black colleagues whose work was praised or that their

conduct was as bad as his conduct.  "[A]dverse actions taken against employees who are not

similarly situated cannot establish an inference of discrimination." *Littlejohn v. City of New*

---

[7]        If Fox had evidence that letters-to-file were not issued to similarly-situated black, non-Christian, or
younger staff members, such evidence would be relevant to his claim as circumstantial evidence of discriminatory
intent, even if they do not qualify as "adverse employment actions."

*York*, --- F.3d ---, ---, No. 14-1395-cv, *slip op.* at 36 (2d Cir. Aug. 3, 2015). "'The standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases . . . .'" *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 494 (2d Cir. 2010) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (alteration omitted)). "In other words, the comparator must be similarly situated to the plaintiff 'in all material respects.'" *Id.* (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)). Fox has not articulated any similarities between him and the people who were praised – one was a counselor (albeit a SAPIS counselor), but it is not clear that she or the others engaged in bad behavior similar to Fox's. Accordingly, without a shred of evidence that any action taken against him was motivated by his race, Fox's race-based discrimination claim must be dismissed.

## 2. Religion

It is not clear that Fox is arguing that he was suspended or terminated because he is Christian; it may be that he is trying to argue that he was subjected to a religiously-hostile work environment. Fox has no evidence that any of the adverse actions that Bradley took against him were motivated by his Christianity.[8] Fox's argument relies heavily on his observation that "Dean Kwateng, Ms. Robinson, and Ms. Bradley . . . are of a different sect of Christianity than [Fox]," Fox Dep. at 134; as with his race claims, however, Fox does not even attempt to establish that he was similarly situated to Kwateng or Robinson.

Fox attempts to shoehorn one of his many disputes with Bradley – specifically, Bradley's ire over his failure, while suspended, to provide requested information regarding a student's ACS caseworker during an emergency – into a religious dispute. *See id.* at 139-40 (arguing that Fox

---

[8]       The Court uses "Christianity" to refer to Fox's religion only colloquially; it understands that Fox characterizes his religion as "Jewish/Christian," and that is distinct, in his view, from being just Christian. *See, e.g.*, Fox Dep. at 126-27. Any such distinction does not affect the Court's analysis.

did not provide the information to Bradley because his union told him "not to function as a guidance counselor while [he was] suspended" and that his Christianity instructed him "not to break rules").  There is no evidence, and Fox does not allege, that Bradley's reason for asking him the name of the student's ACS caseworker was related to Fox's religion, or that Bradley's irritation when Fox did not comply was the product of a religious animus.[9]  In any event, this lone example, coming after more than a year of disagreements between Fox and the Principal, does not support an inference that Fox's suspension or termination was motivated by discrimination; it simply underscores the broken relationship between Fox and Bradley.  Similarly, Fox's description of Bradley's request that Fox wash cafeteria tables, featuring, in Fox's retelling, an incomprehensible analogy to Jesus's washing the feet of the apostles, does not suggest that the BOE's decision to suspend and terminate Fox was motivated by religious animosity.

Although the plaintiff's burden in establishing a *prima facie* case of discrimination "'has been characterized as 'minimal' and '*de minimis*,''" *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173) (2d Cir. 2005)), it is not non-existent, *see Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 77 (2d Cir. 2005).  In the context of his race- and religion-based claims, Fox has adduced no "'evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion.'"  *Id.* at 80 (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312

---

[9]    On some level Fox's claim as discussed during his deposition is akin to a failure to accommodate – Bradley did not make the request because Fox was Christian, but Fox was unable to comply because of his religion and was punished for his failure to comply.  There is no evidence, however, that Fox told Bradley that he could not tell her who the girl's caseworker was because to do so would be incompatible with Fox's religion.  *Cf. Baker v. Home Depot*, 445 F.3d 541, 546 (2d Cir. 2006).

(1996) (alterations and emphasis omitted)).  Accordingly, Defendant is entitled to summary

judgment on these claims.[10]

### 3.  Age

Fox represented at oral argument that "the primary discriminatory foundation of this case

is age discrimination."  Oral Arg. at 25.  In support of his age discrimination claims – unlike his

other causes of action – Fox offers four affidavits from other senior employees at P.S. 150, who

attest that Bradley appeared to be targeting older members of the staff for termination or hostile

treatment.  *See* Fox Decl. Exs. 5-8.  Those affidavits are some evidence supporting the inference

that age might have been a motivating factor for the adverse actions taken against Fox.

Accordingly, with respect to age discrimination only, Fox has carried the "*de minimis*" burden of

establishing a *prima facie* case of discrimination.

### 4.  Retaliation

Fox also alleges that the BOE retaliated against him based on his complaints to the New

York State Division of Human Rights.  Am. Compl. at 3.  Like discrimination claims,

"retaliation claims are reviewed under the burden-shifting approach of *McDonnell Douglas*."

*Kwan*, 737 F.3d at 843.  "To make out a *prima facie* case of retaliation, a plaintiff must

demonstrate that '(1) []he engaged in protected activity; (2) the employer was aware of that

activity; (3) the employee suffered a materially adverse action; and (4) there was a causal

connection between the protected activity and that adverse action.'"  *Kelly v. Howard I. Shapiro*

*& Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (*per curiam*) (quoting *Lore v.*

*City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)).  Fox engaged in protected activity on June

25, 2012, when he filed a complaint with the State Division of Human Rights.  56.1 ¶¶ 3-4.  The

---

[10]     Because Defendant is entitled to summary judgment on other grounds, the Court does not reach
Defendant's argument that Fox did not administratively exhaust his religious discrimination claim.

BOE does not challenge its awareness of Fox's complaint but takes issue with the third and fourth prongs of the *prima facie* case.

As to the third prong, the existence of an adverse action, Defendant's briefing misses the mark. Defendant cross-references to its prior briefing regarding Plaintiff's discrimination claims to argue that the "letters-to-file" do not constitute adverse employment actions. Def. Mem. at 15. Defendant may well be right – but the standard for retaliation relies on the presence or absence of a "materially adverse action," which is distinct from an "adverse employment action." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62-63 (2006) (citing 42 U.S.C. §§ 2000e-2 and 2000e-3). Courts analyze whether an action is materially adverse "objectively, based on the reactions of a reasonable employee. But 'context matters, as some actions may take on more or less significance depending on the context.'" *Rivera v. Rochester Genesee Reg'l Transp. Auth.,* 743 F.3d 11, 25 (2d Cir. 2012) (quoting *Tepperwien v. Entergy Nuclear Operations, Inc.,* 663 F.3d 556, 568 (2d Cir.2011) (alteration and internal citation omitted)). The *sine qua non* of material adversity is whether "'it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *White,* 548 U.S. at 68). Given Fox's *pro se* status and the Defendant's failure to articulate the correct standard in its moving papers, the Court will assume that a reasonable worker who suspected that his employer would respond to a complaint to the State Division of Human Rights with threatening letters-to-file would be dissuaded from making the complaint.

Even with the first three prongs met, however, Fox is unable to establish a *prima facie* case of retaliation. Of the many letters-to-file that Fox received, only two postdated his complaint to the Human Rights Division. The documentation of Fox's poor performance and bad behavior *predating* his June 2012 complaint include: allegations of dissembling and unsatisfactory data entry, Fox Dep. Ex. D; misrepresentations and failure to create and provide

required documentation for the school, Fox Dep. Ex. E; failure to report to an assigned post

without excuse, Fox Dep. Ex. G; unauthorized disclosure of confidential student information,

Fox Dep. Ex. H; unauthorized early departures and rude behavior, Fox Dep. Ex. I; poor judgment

and lack of accountability for students in crisis, Fox Dep. Ex. J; poor judgment, poor

communication, and insubordination during another crisis, Fox Dep. Ex. K; and insubordination,

failure to follow protocol, poor judgment, and deliberate disregard for the Principal's

instructions, Fox Dep. Ex. L.  If anything, the fact that Fox was written up only twice in the post-

June 2012 period suggests that the letters-to-file ebbed after Fox's protected activity.  Given the

history of Fox's relationship with Bradley, there is simply no basis to infer that the letters

subsequent to the Division of Human Rights complaint – or the disciplinary actions predicated

on those and other letters– were the result of retaliatory animus.[11]

Fox alleged during his deposition that Bradley retaliated against him by requiring him to

attend the same meeting twice at the beginning of the 2012-13 school year.  Fox Dep. at 64.

Such an insignificant annoyance is plainly insufficient even to meet the more generous

"materially adverse action" standard.  *Cf. Thomas v. City of New York*, 953 F. Supp. 2d 444, 461

(E.D.N.Y. 2013); *Klein v. N.Y. Univ.*, 786 F. Supp. 2d 830, 849 (S.D.N.Y. 2011).  Fox further

alleges that when he and a coworker were disciplined that fall, the co-worker, "who was just

appointed to the school[,] was not disciplinary [sic] charged with a letter.  But [Fox] was, out of

---

[11]      The disciplinary charges were brought nearly four months after Fox's complaint and were predicated on
years of misconduct and poor performance by Fox.  There is no plausible inference that they were filed because of
Fox's complaint, rather than his work, which was consistently unsatisfactory (to his supervisor).  *See Howard v. City
of New York*, 602 F. App'x 545, 549 (2d Cir. 2015) (summary order) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532
U.S. 268, 273 (2001)); *see also Dixon v. Int'l Fed'n of Accountants*, No. 09-CV-2839(HB), 2010 WL 1424007, at
*6 (S.D.N.Y. Apr. 9, 2010), *aff'd by summary order*, 416 F. App'x 107, 110 (2d Cir. 2011) (four months too long to
establish causality through temporal proximity); *Wolf v. Time Warner, Inc.*, No. 09-CV-6549(RJS), 2012 WL
4336232 (S.D.N.Y. Sept. 17, 2012), *aff'd by summary order*, 548 F. App'x 693, 695-96 (2d Cir. 2013) (two
months); *Stoddard v. Eastman Kodak Co.*, 309 F. App'x 475, 480 (2d Cir. 2009) (summary order) (two months);
*Cody v. Cnty. of Nassau*, 345 F. App'x 717, 719 (2d Cir. 2009) (summary order) (five months).

retaliation."  Fox Dep. at 67.  There is no evidence suggesting that Fox's new coworker shared

his extensive disciplinary history; accordingly, this is an insufficient basis from which retaliatory

motive may be inferred.  No other evidence supports Fox's claim that the Defendant retaliated

against him because of his protected activity.

### B.  Fox's Showing that the Non-Discriminatory Reasons Proffered Were Pretext

Defendant's non-discriminatory basis for the adverse actions taken against Fox are well-

documented, and the parties have been litigating their adequacy in an Article 78 proceeding.  *See*

Downs Decl. Ex. B and Supreme Court Order.  Defendant proffered 22 reasons for Fox's

termination; 19.5 were recognized as legitimate by the hearing officer, and approximately 18.5

were held to be legitimate even by Justice Schlesinger.  Downs Decl. Ex. B., Supreme Court

Order.[12]

Because the BOE has articulated a "legitimate, nondiscriminatory reason for its action,"

Fox must "present[] facts, which 'taken in his favor, suffice to show that a triable issues exists as

to whether his age was a 'but for' cause of his termination.'"  *Delaney*, 766 F.3d at 168 (quoting

*Gorzynski*, 596 F.3d at 106) (other quotation marks, citations, and alterations omitted).  "'The

condition that a plaintiff's age must be the 'but for' cause of the adverse employment action is

not equivalent to a requirement that age was the employer[']s *only* consideration, but rather that

the adverse employment action *would not have occurred without it*.'"  *Id.* at 169 (quoting *Fagan

v. U.S. Carpet Installation, Inc.*, 770 F. Supp. 2d 490, 496 (E.D.N.Y. 2011)) (alteration omitted,

emphasis in *Delaney*).

---

[12]    The Court agrees with Justice Schlesinger that recitation of the 22 specifications levied against Fox is
"tedious" and refers readers to the two opinions discussing those specifications, rather than repeating them here.  *See*
Supreme Court Order at 2, Down Decl. Ex. A.

The strongest argument in support of Fox's position is Justice Schlesinger's view that the punishment imposed for Fox's numerous infractions was too severe.  Punishment in excess of what is appropriate for the proven transgressions could, in some circumstances, tend to suggest that the proffered reason is not the only basis for the adverse action – leaving room for the possibility that discriminatory or retaliatory animus explains the "gap" between the legitimate basis and the more severe adverse action.  In this case, however, any such gap is better explained by Bradley's genuine animosity towards Fox.  Bradley – fairly or unfairly – disliked Fox and punished him accordingly.  She may, as Justice Schlesinger intimated, have nit-picked as a result of her "conclu[sion] that Mr. Fox was not to her liking and should not continue working at the school, now her school."  Supreme Court Order at 3.[13]  But unduly harsh punishment predicated on personal animosity, even if unfair, is not actionable under Title VII or the ADEA.  *See Novak v. Waterfront Comm'n of N.Y. Harbor*, 928 F. Supp. 2d 723, 732 (S.D.N.Y. 2013) ("'Title VII prohibits discrimination; it is not a shield against harsh treatment at the work place.  Personal animosity is not the equivalent of [] discrimination and the plaintiff cannot turn a personal feud into a [] discrimination case.'") (quoting *Doherty v. Nederlander Producing Co.*, No. 04-CV-3324(LTS), 2006 WL 2239421, at *5 (S.D.N.Y. Aug. 4, 2006) (alterations omitted)).  Justice Schlesinger "believe[d] the actual predicate for [Bradley's animosity towards Fox] [to be] an event that occurred in a highly charged meeting on June 1, 2011," when Fox "became emotional" and Bradley reacted by telling him "You're finished."  Supreme Court Order at 3.  Although perhaps an overreaction, even if Justice Schlesinger is correct, this hidden "actual predicate" is not race-, religion-, or age-based discrimination or retaliation.

---

[13]     While Justice Schlesinger seems to think that Bradley was nit-picking, based on the record adduced in this case, an equally reasonable conclusion was that Bradley was trying to run a school and was dealing with a recalcitrant guidance counselor who was at times quite good at his job but could not be trusted to tell the truth and was insubordinate.  Regardless of which view is correct, Fox has not demonstrated that Bradley's motive was pretextual.

Fox's argument that Defendant's motivations were pretextual is unpersuasive – he
contends that the four affidavits from other senior faculty and staff at P.S. 150, who also felt put-
upon by Bradley, establish a basis for a factfinder to conclude that Defendant was not genuinely
motivated by the 22 specific infractions that it identified.  The Court disagrees.  Crediting the
affidavits as the Court must, Fox has established that a "woman from C.F.N." once
"aggressively" asked several older members of the staff when they intended to retire.  Wachuku
Aff. ¶ 4; Muniz Aff. ¶ 7; Troici Aff. ¶¶ 22-23.  There is no basis to impute whatever motivated
this incident to Bradley.  Fox has also established that Bradley micro-managed faculty and staff
in a way that the senior members of the school did not appreciate.  Wachuku Aff. ¶¶ 5-6
(complaining about "excessive work" when she was asked "to help [a] co-teacher ready another
classroom for the students"); Troici Aff. ¶¶ 6-9, 25 (complaining about "walk-throughs" to
observe her teaching); Chalil Aff. ¶¶ 8-10 (complaining about Bradley's excessive directions and
recommendations).  Only Troici expressly tied the mistreatment to age, asserting that Bradley
observed her classes more frequently than those of the younger teachers.  Bradley also
mentioned to her "the belief that there are not enough funds in the school budget to pay for
senior staff salaries."  Muniz Aff. ¶ 6; *see* Troici Aff. ¶ 26, Chalil Aff. ¶ 11.[14]

To survive Defendant's motion, however, Fox must do more than create the suspicion
that Bradley was concerned that her senior faculty and staff costed too much – he must show
that, all things being equal, he would not have been subjected to the same adverse employment

---

[14]  Decisions motivated by *salary* are distinguishable from those motivated by *age*.  *Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 117 (2d Cir. 1991) ("[T]here is nothing in the ADEA that prohibits an employer from making employment decisions that relate an employee's salary to contemporaneous market conditions and the responsibilities entailed in particular positions and concluding that a particular employee's salary is too high.  To be sure, high salary and age may be related, but, so long as the employer's decisions view each employee individually on the merits, do not impose a general rule that has a disparate impact on older workers, and are based solely on financial considerations, its actions are not barred by the ADEA.") (internal citation omitted); *see also Smith v. City of Jackson, Miss.*, 544 U.S. 228, 242 (2005).

actions if he were younger. *Delaney*, 766 F.3d at 168 (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 173 (2009)). But the fact that several other faculty and staff at P.S. 150 who were over 40 years old disliked Bradley's management style, or even that they felt that Bradley wanted them to retire, is by no means an indication that the BOE would not have suspended or terminated a younger guidance counselor for the 22 disciplinary infractions Fox racked up. Fox has not adduced any evidence that would support such a conclusion. If a younger counselor, confronted with his or her ineptitude, became defensive and emotional and yelled at the Principal, then over the ensuing year accrued dozens of disciplinary infractions and demonstrated lack of organization and poor judgment, the BOE would likely have pursued the same adverse action against that younger staff member. There is no evidentiary basis on which a jury could conclude otherwise. Put differently, the Plaintiff has adduced no evidence from which a reasonable factfinder could conclude that the Defendant's stated reason for suspending and terminating Fox was pretext to disguise a discriminatory motive.[15]

### III. Defendant Is Entitled to Summary Judgment on Fox's Unpled Hostile Work Environment and Sexual Harassment Claims

Fox did not plead claims for hostile work environment or sexual harassment; nevertheless, to the extent that his summary judgment briefing assumes that these claims are part of the case, the Court notes that Defendant would be entitled to summary judgment on both.

"To prove a hostile work environment claim under Title VII, a plaintiff must show that his 'workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

---

[15] Fox does not meaningfully distinguish, for the purpose of proving pretext, between his race-, religion-, and age-based discrimination claims, or between those claims and his retaliation claim. Pl. Mem. at 4-6. Fox does not, however, adduce *any* evidence that could lead a factfinder to conclude that the BOE's proffered basis for his suspension and termination was pretext for any type of discrimination or retaliation. Accordingly, even if Fox had established a *prima facie* case of another form of discrimination or retaliation, Defendant would nevertheless be entitled to summary judgment.

abusive working environment.'" *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir.

2015) (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993)).  "This standard has both

objective and subjective components: the conduct complained of must be severe or pervasive

enough that a reasonable person would find it hostile or abusive, and the victim must

subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97,

114 (2d Cir. 2014).  "It is axiomatic that the plaintiff also must show that the hostile conduct

occurred because of a protected characteristic." *Tolbert*, 790 F.3d at 439 (citing *Alfano v.

Costello*, 294 F.3d 365, 374 (2d Cir. 2002)).  Fox has alleged that Bradley scolded him,

sometimes in the presence of other staff, and had too short of a fuse.  This is "far short of the

'steady barrage of opprobrious [discriminatory] comments' required for a hostile work

environment claim." *Thelwell v. City of New York*, No. 13-CV-1260(JGK), 2015 WL 4545881,

at *11 (S.D.N.Y. July 28, 2015) (quoting *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir.

2006)).  Bradley's invocation of the image of Christ washing the apostles' feet when directing

Fox to wash the cafeteria tables is precisely the sort of "episodic" or "isolated" act that does not

meet the standard of severity or pervasiveness necessary to support a federal hostile work

environment claim.  *Tolbert*, 790 F.3d at 439 (citing *Alfano*, 294 F.3d at 374).

Finally, Fox's sexual harassment claim is predicated on the fact that Bradley "not once

but twice said, I like to hear your sexy voice on the loud speaker."  Oral Arg. at 21.  Bradley

never touched Fox inappropriately, but when the staff had occasion to dress less casually, "she

would say flirtatious things, like, you look really good, look at Mr. Fox, that kind of thing."  *Id.*

at 21-22.  Even if we assume that Bradley's comments were offensive, "they appear to have been

isolated and were not as substantial" as is necessary to state a sexual harassment claim.

*Raspardo*, 770 F.3d at 118.  Accordingly, Defendant would be entitled to summary judgment on

any such claim that could be derived from Fox's Amended Complaint.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED, and judgment is to be entered for the Defendant.  The Clerk of the Court is directed to terminate docket entry 36 and to terminate the case.  The Clerk of the Court is directed to provide a copy of this Opinion to Plaintiff and to note service on the docket.

**SO ORDERED.**

**Date:  August 20, 2015**
      **New York, NY**

**VALERIE CAPRONI**
**United States District Judge**